# Clarkson

Glenn Danas, Esq.
Partner

Brent A. Robinson, Esq.
Counsel

Christen L. Chapman, Esq.
Counsel

Clarkson Law Firm P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Direct: (213) 786-1071
Fax: (213) 788-4070
gdanas@clarksonlawfirm.com
brobinson@clarksonlawfirm.com
cchapman@clarksonlawfirm.com

May 29, 2026

**VIA CM/ECF**

Ms. Molly C. Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
The Richard H. Chambers U.S. Courthouse
125 South Grand Avenue
Pasadena, CA 91105

> **Re:** ***Madero, et al. v. McLane Foodservice, Inc., et al.*, Case Nos. 25-1341 and 25-1798*; Submission Per Fed. R. App. P. 28(j) and Circuit Rule 28-6**

Dear Ms. Dwyer:

Per FRAP 28(j), Appellants submit this notice of a supplemental authority that recently issued, namely the decision in *Flowers Foods, Inc., et al. v. Brock,* No. 24-935 (U.S. May 28, 2026) (attached as **Exhibit A**).

*Flowers Foods* confirmed that the Federal Arbitration Act's exemption for interstate transportation workers is broad enough that

Ms. Molly C. Dwyer
Clerk of the Court
May 29, 2026
Page **2** of **2**

"[a]t least sometimes, a worker who transports goods on an intrastate leg of an interstate journey can qualify for §1's exemption …." Exhibit A at p. 3. This is due primarily to the broad language of that exemption as understood at the time of enactment. *Id.* at 4 (quoting Black's Law Dictionary 661, 1001 (3d Ed. 1933)).

The Court emphasized that purely intrastate transportation falls within the transportation worker exemption where it is part of a continuous interstate journey, citing the example of an interstate transport of baked goods where the final intrastate leg was exempt despite temporary pauses along the way, specifically because "the contract required" delivery to the ultimate intrastate destination. *Id.* at 5, emphasis added. But the Court suggested that the analysis might differ if title had passed to the local distributor prior to the intrastate transport leg. *Id.* at 7–8.

This appeal concerns whether the FLSA Motor Carrier Exemption applies to the purely intrastate transportation of goods at issue here. The parties dispute whether the continuous interstate journey ended upon delivery to Appellees' local warehouse, given that the contracts pursuant to which the goods were shipped only specified delivery to that warehouse, any ultimate local destination was determined only after the goods were delivered to the warehouse and sales negotiated, and where title to the goods passed to Appellee on delivery to the warehouse. *See* First Brief at 17–41; Second Brief at 16–37; Third Brief at 14–43. *Flowers Foods* indicates the interstate journey here concluded upon delivery to the warehouse, such that the Motor Carrier Exemption does not apply.

Respectfully submitted,

*/s/ Brent A. Robinson*
Brent A. Robinson

cc: All Counsel of Record (via CM/ECF)

# EXHIBIT A

(Slip Opinion)  OCTOBER TERM, 2025  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLOWERS FOODS, INC., ET AL. *v.* BROCK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 24–935.  Argued March 25, 2026—Decided May 28, 2026

The Federal Arbitration Act (FAA) requires courts to enforce many private arbitration agreements, but it also provides that "nothing" in the law shall be used to compel arbitration in disputes involving the "contracts of employment" of any class of workers "engaged in . . . interstate commerce."  9 U. S. C. §1.  This case poses the question whether someone can qualify as a worker under the §1 exemption if he never crosses state lines and never interacts with vehicles that do.  Flowers Foods, Inc., is a large producer of packaged baked goods with bakeries in 19 States.  To get its products to market, the company depends in part on franchisees who buy the distribution rights to Flowers's products in specific geographic territories.  Angelo Brock is one such franchisee serving the Denver area; he picks up Flowers's products from a warehouse in Colorado and delivers them to local stores, all without leaving the State.  In 2022, Brock sued Flowers in federal district court alleging that the company had underpaid him and other distributors in violation of various federal and state laws.  Flowers moved to compel arbitration, arguing that the FAA generally requires courts to stay or dismiss cases when the parties have agreed to resolve their disputes by arbitration and that Brock had signed a distribution agreement promising to arbitrate any disagreement.  The district court denied Flowers's motion, and the Tenth Circuit affirmed.  Resting its decision on 9 U. S. C. §1, the Tenth Circuit reasoned that Brock belonged to a class of workers engaged in interstate commerce and thus the court lacked authority to compel arbitration.

*Held*: A worker who transports goods on an intrastate leg of an interstate journey can qualify for §1's exemption without crossing state lines or interacting with vehicles that do.  Pp. 3–8.

2                FLOWERS FOODS, INC. *v.* BROCK

Syllabus

(a) The statutory text does not support a rule requiring workers to cross state lines or interact with vehicles that do. When the FAA was enacted, to "engage" meant to "take part in" something or to be "employ[ed]" or "involve[d]" in that thing. Black's Law Dictionary 661. And "interstate commerce" meant "[t]raffic," "intercourse," or "the transportation of persons or property between or among the several states . . . or from or between points in one state and points in another state." *Id.*, at 1001. Nothing in those terms requires an individual to cross state lines or interact with a vehicle that does. Interstate commerce includes transporting products "between points in one state and points in another state," *ibid.*, which involves not just crossing state lines but intrastate activity too; "a continuous carriage" may begin in one State and end in another while "much of the journey" takes place "within the limits of a single state," Cyclopedic Law Dictionary 548. And at least sometimes, a person can take part, be employed, or be involved in that continuous journey without leaving a State or touching vehicles that do. Pp. 4–5.

(b) Historical precedent supports this interpretation. In *The Daniel Ball*, 10 Wall. 557, the Court held that a steamer transporting goods entirely within Michigan was "engaged in commerce between the States" because it "was employed in transporting goods destined for other States, or goods brought from without . . . Michigan." *Id.*, at 565. The Court explained that "[t]he fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction." *Ibid.* Other cases are to similar effect. See, *e.g., Rearick* v. *Pennsylvania*, 203 U. S. 507; *Rhodes* v. *Iowa*, 170 U. S. 412; *Norfolk & Western R. Co.* v. *Pennsylvania*, 136 U. S. 114. Pp. 5–6.

(c) Flowers's counterarguments are unavailing. Flowers observes that the cases above interpreted the Constitution's Commerce Clause, not §1 of the FAA. The Court does not suggest that the scope of §1 is coterminous with the scope of the Commerce Clause as interpreted at the time of the FAA's adoption in 1925. However, cases using the same language as §1, or formulations very close to it, offer probative evidence of what an ordinary person at the time of the FAA's enactment would have understood its terms to mean.

Flowers hints at other reasons why Brock might not qualify for §1's exemption, including that Flowers conducts its business with Brock through a distribution agreement with an independently operated company Brock owns, and that he orders and purchases Flowers's goods, taking title to them, before selling them to local stores—facts that some lower courts have found relevant. However, while Flowers discusses these facts in passing, it does not ask the Court to decide

Syllabus

their legal significance, instead venturing all upon one cast by asking the Court to adopt a bright-line rule that an individual can never qualify for §1's exemption unless he crosses state lines or interacts with vehicles that do. The statutory text cannot support such a rule. Pp. 6–8.

121 F. 4th 753, affirmed.

GORSUCH, J., delivered the opinion for a unanimous Court.

Cite as: 608 U. S. \_\_\_\_ (2026)	1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–935

FLOWERS FOODS, INC., ET AL., PETITIONERS *v.*
ANGELO BROCK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[May 28, 2026]

JUSTICE GORSUCH delivered the opinion of the Court.

The Federal Arbitration Act requires courts to enforce many private arbitration agreements. But not all. Section 1 of the Act provides that "nothing" in the law shall be used to compel arbitration in disputes involving the "contracts of employment" of any class of workers "engaged in . . . interstate commerce." 9 U. S. C. §1. This case is the latest in a line posing questions about the scope of that exemption.

I

Flowers Foods, Inc., is one of the Nation's largest producers of packaged baked goods. Some of its familiar products include Butterscotch Krimpets, Jumbo Honey Buns, and Wonder Bread, "which it promotes with a 95-foot-tall hot air balloon and a parade float called The Wondership." *Bissonnette* v. *LePage Bakeries Park St., LLC*, 601 U. S. 246, 249 (2024). From its bakeries in 19 States, Flowers distributes its products across the country.

To get its products to market, the company depends in part on franchisees who "buy the rights to distribute Flowers['s] products in particular geographic territories." *Ibid.* This case involves one such franchisee, Angelo Brock, who

Opinion of the Court

serves the Denver area. Brock picks up Flowers's products from a warehouse in Colorado and delivers them to local stores, all without leaving the State.

In 2022, Brock sued Flowers in federal district court alleging that the company had underpaid him and other distributors in violation of various federal and state laws. In response, Flowers filed a motion asking the court to send the dispute to arbitration. In support of its motion, Flowers observed that the Federal Arbitration Act (FAA) generally requires courts to stay or dismiss cases when the parties have agreed to resolve their disputes by arbitration rather than litigation. And Flowers argued that rule applied here because Brock had signed a distribution agreement promising to arbitrate any disagreement that might arise between himself and Flowers. Ultimately, the district court denied Flowers's motion and, in an opinion by Judge Phillips, the Tenth Circuit affirmed.

The Tenth Circuit rested its decision on 9 U. S. C. §1. While the FAA requires courts to enforce arbitration agreements in many circumstances, §1 contains an exception. It provides that "nothing" in the statute shall be used to compel arbitration in disputes involving "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." §1. Reasoning that Brock belonged to a class of workers engaged in interstate commerce, the court concluded that it lacked authority to compel the arbitration Flowers sought. To be sure, the court recognized, Brock does not cross state lines himself or interact directly with those who do. 121 F. 4th 753, 757–761 (CA10 2024). But, the court held, those facts were "not dispositive." *Id.*, at 761. Instead, the court said, what mattered was that Brock's "intrastate route formed a constituent part of the . . . interstate journey" of Flowers's goods from out-of-state bakeries to their intended destinations at retail stores. *Id.*, at 764; see also *id.*, at 766.

Opinion of the Court

Flowers petitioned for certiorari. In doing so, it asked us to resolve a single question: whether someone can qualify as a worker "engaged in . . . interstate commerce" under §1 if he never crosses state lines and never interacts with vehicles that do. Pet. for Cert. i. We agreed to take up that question. 607 U. S. \_\_\_ (2025).

II

In recent years, we have had occasion to address the scope of §1's exemption no fewer than three times. In each case, we have rejected efforts to cabin its reach. First, in *New Prime Inc.* v. *Oliveira*, 586 U. S. 105 (2019), we held that the "contracts of employment" §1 embraces include contracts governing independent contractors, not just employees. *Id.*, at 116. Then, in *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450 (2022), we held an airline worker who loaded and unloaded cargo fit within §1's exemption even though she did not fly planes or otherwise cross state lines. *Id.*, at 459, 461. Finally, in *Bissonnette*, we held that a worker can fall under §1 whether he is employed in the "transportation industry" or some other, so long as his work "play[s] a direct and necessary role in the free flow of goods across borders." 601 U. S., at 256 (internal quotation marks omitted).

Make this case the fourth. Before us, Flowers's sole theory is that, to be engaged in interstate commerce for purposes of §1, a worker must either cross state lines or interact with a vehicle that does (say, by loading or unloading the goods it carries). That theory is incorrect. We have already held in *Saxon* that §1 does not require workers to cross state lines. 596 U. S., at 459, 461. Nor, we now add, does §1 turn on a game of tag with vehicles that do. At least sometimes, a worker who transports goods on an intrastate leg of an interstate journey can qualify for §1's exemption without satisfying either of those criteria.

4          FLOWERS FOODS, INC. *v.* BROCK

Opinion of the Court

Start with the statutory text.  Section 1's exemption applies to "workers engaged in . . . interstate commerce." When the FAA was enacted, to "engage" meant to "take part in" something or to be "employ[ed]" or "involve[d]" in that thing.  Black's Law Dictionary 661 (3d ed. 1933) (Black's); see also Webster's New International Dictionary 725 (1913) ("To embark in a business; to take a part; to employ or involve one's self; to devote attention and effort").  And "interstate commerce" meant "[t]raffic," "intercourse," or "the transportation of persons or property between or among the several states of the Union, or from or between points in one state and points in another state."  Black's 1001; see also Cyclopedic Law Dictionary 548 (2d ed. 1922) (Cyclopedic) ("A shipment from one state to another under a contract for continuous carriage is interstate commerce, even as to so much of the journey as is within the limits of a single state").

Nothing in those terms requires an individual to cross state lines or interact with a vehicle that does.  Interstate commerce includes transporting products "between points in one state and points in another state."  Black's 1001. That involves not just crossing state lines, but intrastate activity too.  Though "a continuous carriage" may begin in one State and end in another, "much of the journey" can take place "within the limits of a single state."  Cyclopedic 548.  And at least sometimes, a person can "take part," be "employ[ed]," or be "involve[d]" in that continuous journey without leaving a State or touching vehicles that do. Black's 661.

Some hypotheticals help illustrate the point.  Imagine Customer A in State A enters a contract to purchase a truckload of Butterscotch Krimpets from Company B in State B.  Company B makes the Krimpets in State B, but the contract requires Company B to deliver them to Customer A's headquarters in State A.  So, Company B hires a driver to take the Krimpets from the bakery in State B to

Opinion of the Court

the headquarters in State A. All agree that the driver in a case like that is engaged in interstate commerce.

Now imagine instead that Company B hires three drivers to make the delivery. Driver 1 takes the Krimpets from Company B's bakery right up to the border between States A and B. He then gets out of his truck, unloads pallets of Krimpets on his side of the border, and drives home. Driver 2 then picks up the Krimpets, drives ten feet across the border, puts the Krimpets down again, and heads off. Finally, Driver 3 picks up the Krimpets in State A and delivers them to Company A's headquarters. Who was engaged in interstate commerce? On Flowers's account, only Driver 2 would be—neither Driver 1 nor Driver 3 crossed state lines or touched a vehicle that had. But that cannot be right. Each of the drivers played a direct, active, and necessary part in ensuring the Krimpets got from a point in State B (the bakery) to a point in State A (the headquarters) as the contract required.

This hypothetical, really, is hardly a hypothetical at all. This Court confronted similar facts more than 150 years ago in *The Daniel Ball*, 10 Wall. 557 (1871). There, a steamer transporting goods on Grand River operated "entirely within the limits of the State" of Michigan. *Id*., at 565. The steamer "did not run in connection with, or in continuation of, any line of vessels or railway leading to other States," but "was employed in transporting goods destined for other States, or goods brought from without the limits of Michigan and destined to places within that State." *Ibid.* Still, the Court held, the steamer "was engaged in commerce between the States." *Ibid.* As the Court put it, "[t]he fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction." *Ibid.* In other words, the steamer was "engaged in" interstate commerce even though it stayed in Michigan,

and even though it did not come into direct contact with a vessel that had crossed state lines.

Other cases are to similar effect. In *Rearick* v. *Pennsylvania*, 203 U. S. 507 (1906), we held that a Pennsylvania salesman who picked up goods shipped from out of state and delivered them to their final destination was "engaged in interstate commerce" with no indication that he ever left Pennsylvania or interacted with vehicles that had. *Id.*, at 510–513. In *Rhodes* v. *Iowa*, 170 U. S. 412 (1898), we held that a railroad agent who moved a package from a train "platform to [a] freight warehouse" entirely within one State could, in certain circumstances, be "part of . . . interstate commerce transportation." *Id.*, at 413–414, 426. And in *Norfolk & Western R. Co.* v. *Pennsylvania*, 136 U. S. 114 (1890), we held that an intrastate portion of an interstate railroad business was "immediately connected with interstate commerce." *Id.*, at 119–120; see also *id.*, at 119 (citing *The Daniel Ball*, 10 Wall., at 565). We could go on.

Flowers's only real answer is to observe that these cases and others like them interpreted the Constitution's Commerce Clause, not §1 of the FAA. Fair enough. We do not mean to suggest that the scope of §1 is coterminous with the scope of the Commerce Clause as it was interpreted at the time of the FAA's adoption in 1925. After all, §1 "exempts from the FAA only contracts of employment of *transportation* workers." *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 119 (2001) (emphasis added). And the statute speaks of transportation workers "engaged in" interstate commerce, while Congress sometimes uses broader terms, like "affecting" or "involving" interstate commerce, when it wishes to regulate to the outer bounds of its authority under the Commerce Clause. *Saxon*, 596 U. S., at 458 (internal quotation marks omitted). At the same time, we can hardly blind ourselves to what this Court's cases said, both before and around the time of the FAA's adoption, about what it means to be "engaged in commerce between the States."

Opinion of the Court

*The Daniel Ball*, 10 Wall., at 565. We think cases using the same language as §1, or formulations very close to it, offer probative evidence of what an ordinary person at the time of the FAA's enactment would have understood its terms to mean.

To be sure, and as Flowers highlights, we have held that the phrase "engaged in" interstate commerce in §1 denotes a "direct," "necessary," and "activ[e]" role in moving goods across borders. *Saxon*, 596 U. S., at 458 (internal quotation marks omitted). We reaffirm as much today. But we do not see how any of that dictates the rule Flowers seeks. As the hypothetical above and cases like *The Daniel Ball* illustrate, individuals can sometimes be direct, necessary, and active participants in moving goods "from . . . points in one state" to "points in another state" without crossing state lines or interacting with vehicles that do. Black's 1001.

Unable to persuade us that the FAA incorporates its cross-or-tag rule, Flowers hints at other reasons why Brock might not qualify for §1's exemption. Flowers observes, for example, that it conducts its business with Brock through a distribution agreement it has with an "independently operated compan[y]" he owns. Brief for Petitioners 9. And, indeed, some lower courts have found that relevant when assessing whether a "contract of employment" exists sufficient to trigger §1's exemption. Compare *Fli-Lo Falcon, LLC* v. *Amazon.com, Inc.*, 97 F. 4th 1190, 1197–1198 (CA9 2024) (holding §1 inapplicable to a contract "between two business entities"), with *Silva* v. *Schmidt Baking Distribution, LLC*, 162 F. 4th 354, 356–357 (CA2 2025) (holding §1 applicable to certain agreements with "single-employee corporations"). Flowers also contends that Brock orders, purchases, and takes title to Flowers's goods, before selling them to local stores. Brief for Petitioners 21, 42. And, again, some lower courts have found facts like those relevant when assessing §1's reach. See, *e.g.*, *Rittmann* v. *Amazon.com, Inc.*, 971 F. 3d 904, 916 (CA9 2020) (focusing on

8 FLOWERS FOODS, INC. *v.* BROCK

Opinion of the Court

whether a product has reached its "intended destinatio[n]" under an interstate contract); 121 F. 4th, at 766–767 (considering title changing hands); *Immediato* v. *Postmates, Inc.*, 54 F. 4th 67, 72, 78 (CA1 2022) (holding that intrastate couriers fulfilling take-out orders made within the State are not engaged in interstate commerce).

The trouble is that, while Flowers discusses these facts in passing, it does not ask us to decide their legal significance. Instead, it ventures all upon one cast, asking us to adopt a bright-line rule that an individual can never qualify for §1's exemption unless he crosses state lines or interacts with vehicles that do. And whatever other limits §1 may or may not contain, we do not see how the statutory text can support that one.

\*

The judgment of the Tenth Circuit is affirmed.

*It is so ordered.*